Good morning, Chowdhury owners. Erica Chowdhury, the appellant, Banu Chowdhury. I'm the court's judicial officer. This is two minutes of crude model time. I'll keep an eye on the clock here. There are two main issues in this case. Firstly, the unreasonable method used to calculate the loss amount from the food stamps, which added 14 levels to Mr. Chowdhury's guideline range. And the second is the restitution. Mr. Chowdhury, as you may remember, used an amount of $700,000. So I'll begin with the loss amount first. Co-defendants Banu Chowdhury and Abul Kishan were convicted of the same count of food stamp fraud. The conduct was the same. The time of the time where you moved to the scene was the same. And the evidence on the loss amount restitution was the same. You were triggered at a joint hearing on a loss. For Mr. Kishan, the district court used the direct evidence to calculate the actual loss amount, which was $3,000. Well, the transactions that were covered on the security camera footage, right? Plus the undercover transactions from 2013 to 2013. For Mr. Chowdhury, the district court— Mr. Chowdhury is really not the main character in this, is he? Correct, Your Honor. He was more of a minor participant. That's what I understood. And so what we're really looking at is, did the district court reasonably calculate the estimated loss on the major part of this problem rather than the minor? But the scene was the same, Your Honor. The scene was the same at that time. But they had different goals, responsibilities, as I understand, because she was just an employee. Yes, and Mr. Chowdhury accepted responsibility for that. And that's why he was ideal to you. That's why he didn't dispute when the IRS— Oh, it was the store. And he benefited more, that's absolutely true. There was a scheme. They did it together, but yes, he benefited more. The IRS took— Mr. Chowdhury didn't know Steve was an individual, and that was it. But you've come to the same point, Your Honor. Mr. Chowdhury did an examination, so let's move forward then. So they had to calculate the reasonable estimate of the loss floating from your client's actions. Yes. Because as I understand it, there were different methods proposed. Yes, and the one— And it's disregarded to choose the right method. Or reject them if none of the methods were reasonable and find a reasonable amount. Do you object to the one they selected? Do you think the other two methods were okay? No, Your Honor, I don't. They were wrong, too. They would have been inaccurate. All of them used arbitrary numbers and just sort of rounded up, rounded down without using clear consumers, without using, you know, a random sampling. None of the methods proposed were reasonable. Hold on. You're not an expert, right? Yes. And that expert, I tried to understand what the expert was saying. I wasn't quite clear on it. The expert seemed to say, well, you have to use some kind of random method. If these are random sampling, if you're going to take, figure out an average, and apply that to the entire almost four-year run period, you have to do something to, in order to find a representative sample that you can actually apply that to the whole universe. Here, the court chose one day, less than one day, really, for any of these. You say none of these three were appropriate, so I'm not understanding what the district court should have done. So in this, no loss? No, I think there was a loss, but it had to be a reasonable estimate, which was supported by clear and convincing evidence. So are you suggesting we remand for another determination? I didn't think that's what you asked me. No, you're lying. I just want it all thrown out. I mean, you say what they did was wrong, we didn't offer any other alternative, and therefore throw all the risks into the child. Well, it was their burden. I understand it's their burden. Well, let's go through this. As I understand it, Childry admitted during his confirmation with the agent that he believed he did about 30,000 EBT sales per month, right? The expert looked up the bank records and said that that actually didn't match up. Well, I understood that that's what he said. A rough estimate of the total sales of the time period amounts to 1,325,000, right? That's 800,000 on the total. All right. Well, then I have it wrong. The amount used by the district court was about 700,000, right, which is a little more than half the estimated total sales. In your calculation, it's a third. And what not amounts, I guess I'm trying to figure out why that amounts to a gross deviation from Childry's standard practice of charging 50 cents on the dollar for EBT fraud transactions. The government? Because of EBT? I'm just trying to give some financial, if you will, thought to this. And if he admits this, and he admits he gets 50 cents extra on every dollar, and he makes $1,800,000. I only had him at 1,300,000, and I'm trying to understand why what the district court said, 700,000, 699,000, which is a little more than half of what the total sales would not amount to. I'm sorry. I'm not sure where the 1,300,000 is from. The district court said it was 800,000 total for the three years and eight-month period. But no matter which way you cut it, what the court did was it took a skewed day on the busiest time of the month for these transactions, and it applied it over the entire period, knowing that the store had an insignificant inventory of eligible food. So it was meat, fish, boxed cereal, instant foods like boxed churros. Does it belong to categorizes, or is it a convenience store? I think it was. I think that it was. And so the comparisons that were used, there was no real comparisons for what was used. Just a couple of things here. Excuse me. You're objecting because it was not a theory that had been used before. The theory in theory, it works. But taking this one day out of a four-year period and applying it all over it is not a reasonable estimate. It's not a model that's going to do something. I have a question. I have a couple of questions on the loss calculation. Did you appropriately check below to the loss calculation? Yes, Your Honor, at the sentencing as well as at the restitution hearing. Okay. The government argues that you didn't. Secondly, if we agreed with you on the loss calculation, are you asking that the sentence of incarceration also be fake news? So for the first question, on pages two and three of our report, we sort of lay out where you consistently ask for the direct evidence, direct loss, and then to be applied to the second question. But wasn't that on the restitution question? So the restitution also now argues sort of interchangeably about who was using what number to calculate the guidelines. Right. So my second question, are you asking that the sentencing be fake news? Well, I think it changes its guideline range. So I think a resentencing would be appropriately required. For a resentencing and remand? Yes, Your Honor. In our briefing, we asked for the sentence to be vacated or to be remanded anyway first. Not just the restitution? Yes. I know you're arguing that you don't owe that amount of money, but I'm talking about should the sentence be vacated. Yes. It's primarily the guidelines that the guideline range is a loss amount for the guideline. And then the court, the district court, just reviews that same number for restitution. But it's primarily a loss amount guidelines issue. I'll reserve my time for remand. Go ahead. Good morning, Your Honor. I'm Marcy Ancioso. I'm hearing on behalf of the government. We've used the court. The district court in this case selected the appropriate loss method. The loss method that we're talking about is the full face value of the food stamps. Throughout Mr. Chaudhary's briefing and arguments in this case, he's conflating the two steps of the loss process. The first step is the district court selects that method, full face value food stamps. And the second step is determining the amount of loss. All of this challenge is owed to the amount of loss. So I will focus primarily on that. The district court used reasonable methods in coming up with $699,000, hoping to see true that that represents one afternoon. And that projected to be the entire period. The number was derived from one day as far as, oh, not an entire 24-hour period. But what happened was, during the search warrant, they seized, as part of the evidence, the video footage and on the DVR, that's what was available. And so it is a snapshot in time. It is important to recognize that when the agent testified in this case, he never claimed to be doing some sort of statistical random sample. He never claimed undoing something that a statistician would come in here and do. He said, I'm doing the best with what the evidence available is. But as I understand it, when the food stamp cards come in at the beginning of the month, then there's a lot more business that's done in this store. And as I understand it, this afternoon, the time period that was chosen was at the beginning of the month. That's correct. It was on the 3rd. Yeah. And so that seems to me, basically, to be a non-representative of what was done each day over the course of the period. What's your view? How do you defend that? There are a couple ways to defend it. Mr. Chaudhary talked about how he would bring cash in toward the beginning of the month. And so most of this Friday night EBT transaction that we're talking about is during that window. And then rather than coming up with some sort of static dollar amount or some sort of static transaction number, for example, 50 transactions a day or something like that, the agent used a proportion. And so with that proportion, it was to say it's not x dollar amount or x number of transactions during a busy day. We're calculating a proportion. And so as the month became less busy, and let's say it was the 20th of the month, there might have only been a couple, but 85% of a couple small transactions is really not meaningfully adding to it. And there was no evidence that the two-step stride stopped after the first week of the month. So you're saying that most of the fraud took place in the beginning of the month? Would that be a bit of a representative of time, too? Well, more importantly, that it's a proportion. And so looking at that time frame in the beginning of the month, we get that proportion. And the most unique proportion, 85%. So rather than say, on that day, we saw, I think it was a little over $2,000. So we don't say $2,000 of every day of the month was fraud and therefore multiply that out. We stay looking to see what we can see. And notably, the agent didn't just say, I'm going to pick $19 and go with it. He looked through the video and determined, did he see cash-changing hands? Did he see actual trafficking? And so we're talking about a proportion that was based on actual evidence of trafficking, not just based on the notion that it was a busy time of the month and we knew that fraud was occurring. And in addition, that 85% proportion included a 10% buffer. So that's further providing. And Mr. Chaudry's been open to that now. Further giving some leeway for any idea that if it's overstated later on in the month, the store traffic goes down. Notably, that 10% buffer was given, even though when the agent was watching the video and determining which transactions were fraudulent, he saw a few legitimate food items taking place, like a soda and a candy bar. But he also saw illegitimate items, like alcohol, cigarettes, magazines. So in addition to the cash trafficking, there was also improper sales going on. So a 10% buffer more than accounts for both the illegitimate sales as well as the fact that there was fluctuation later in the month. But the proportion is, to answer your owner's question, the proportion is what makes it reasonable for the entire month. Why is the government the victim here? The government is the victim because the government has the food stamps program. And even though there is no increased cost to the government, such as their food stamps budget, the government now has to spend that much more money to be able to accommodate the same number of needy families who the government's trying to help in the first place. Well, as I understand the program, every month, the knowledgeable recipient would get so much on their quarter, trying to resume to the government, and at the end, if they don't spend all the money in the first month, is there a rollover to the second month, correct? The government's never going to get that money back. Whenever it was allotted, it is allotted. Allotted for providing nutrition to needy families, not allotted for exchanging for cash to be spent on illicit items. So that money has now been diverted. I can see where it's a violation. I can see where it's a violation. I can see where it's a violation to conspire with someone to do that. But I'm a little bit at a loss to figure out how the government becomes effective and is entitled to restitution. It seems to me like the money should go back to the people who are entitled, the people who got the money for the food stamp card. So the problem is, Your Honor, those people are also committing fraud, and that's something the state of Nevada goes after, the individuals who are committing the fraud. So it's all that money that's fraudulently diverted from the government that the government now has to spend. No one goes after them, do they? No, the state of Nevada, I believe, a welfare agency, I don't remember the exact name. It's charged with looking at the individuals. Do they go after them? Do they look at them? They do. I don't know how many or who specifically they looked at in this case, which is just a sort of general separation of labor. The USDA OIG looks at the stores, the ones who are licensed, and then the Nevada entity, who also facilitates the Nevada. Your Honor, I guess this is my point. I'm still having trouble figuring out why the government should get the money back. As a taxpayer, I can understand that, and I'm happy for what the government's doing, but looking at this as a legal question. So restitution is meant to make the victim whole, and in this case, in order to make the government whole, which is to say trying to provide X amount of dollars for the intended purpose, the government now has to spend that extra money to go back and fulfill a program. And so unless Mr. Chaudhry pays back that money, the government and the taxpayers are now working out the same amount of money to cover the same purpose. And the circuit courts that have considered this are consistent on the issue. Most recently, the Allotted Circuit in the Lowell's case that was cited in Mr. Chaudhry's 28-G letter, they affirmed that restitution is not an exact science, but it is true in this case that the last amount was reasonable, as well as restitution, the District Court reasonably concluded that restitution should be the same with the USDA as the victim. Mr. Chaudhry. What about the 44,000? I'm trying to think. I don't know if it was exactly that didn't seem to get taken off from the restitution amount. Correct, Your Honor. There was a seizure done in conjunction with the search warrant where the IRS seized some funds that were in Mr. Chaudhry's bank loan for $44,000, so it looks to be just subtly an oversight in the written judgment, and the government acknowledges that he did already pay that money in the sense that it was seized, and so we would have no objection to having the District Court correct that number. Regarding the comment that was made about the inventory and why perhaps the inventory of the store should have had a higher dollar amount, there was evidence in the record that there was limited eligible inventory, and this store had things like snacks and drinks. At page 10 of the record, the agent testified regarding what he knew about the inventory. There was also information about the undercover operations. They recorded some of what they saw page 170 of the record. He also noted at the time of the application there was nothing to suggest that the store had some sort of above and beyond expensive items, and, Your Honor, to Mr. McIntyre, he wasn't properly categorized. That's done at the time of the application, and if it had actually had such items, such a proportion of items, then it would have been categorized. Otherwise, it couldn't be named a store. Regarding Judge Bishop's question about whether an appropriate objection was made below, there's two different things here. They objected to the loss amount, saying 699 was too high. What they didn't object to was when the District Court said 699 is the total. Mr. Kishan was getting a $3,000 loss. They didn't stand up and say, Your Honor, you're applying two different methods. There's no case law supporting that. They didn't cite any cases denying the District Judge, Your Honor, you cannot do this. They also did not make any law of the case argument which they make in their appellate brief, and so the government was making a distinction to say they were simply arguing 699 was too high. They wanted Mr. Trotter's loss to be only $4,000, even though he admitted he was doing this from the day he got the machine, and so the government was simply pointing out that the District Court was not given an opportunity to respond that it was doing two methods, so there's not a lot in the record about what it was doing, but we do know that the District Court said it had to determine, quote, first amount loss. This is speaking of page 152. There was some discussion about what to do with Kishan. The counsel for Kishan and the government stipulated a $2,000 amount. The court said fine, and then turning back to what he was talking about, that loss amount, he determined it to be 699,000. There's nothing inappropriate about splitting the loss between defendants based on their responsibility, and Trotter actually acknowledged it as brief. It's not unusual to do this, so the government's position does fit into the argument that there were some sort of different methods. There was a single method here, and it was full-page supply of the food stamps. The rest of the questions go to whether it was reasonable to do what the District Court did. The District Court used the available data. The District Court followed similar activities that we see in other cases in front of the District Court. Mr. Trotter, you raised the Eugene case. It looked at store comparisons. We had a store comparison here. It looked at things under fraud cutoff where I believe it was everything under $25 was just illegitimate. Everything above 104 was assumed fraudulent, but what we're talking about is District Courts don't have to employ statisticians. They don't have to do this sort of technique themselves. What they have to do under the guidelines is come up with a reasonable number, and looking at all the evidence in this case, that's what the District Court did here, and it would ask the court to affirm. Thank you for your argument. A group model. The government today, and in its briefing, has used the words limited data. What was available? The government, let's not forget, the government seized and took the inventory and store records for the relevant years when they raided the store in April. They had all of the records, and thus could have used one of the many methods used by the 11th Circuit or by the 7th Circuit to calculate a reasonable loss based on what were they actually selling in the store, how much of the food stamps were used for eligible food items. There were other ways. There's no... It's sort of incorrect, inaccurate. The government is saying... The worry that I have with your argument is, I mean, I tried to give you generally what I thought the loss was and try to come up with that. The only other worry that I have is it seems to me the only way I can overturn the district court in calculating the reasonable estimate of the loss is to say there was clear error. Or in other words, on the entire evidence, I have to be left with the definite and firm conviction that a mistake was committed. Mr. Turner, and... And there were three methods. The district court picked the method they thought was the best method and at that point applied the method. Why is that an unclear error? Because as Judge Schroeder pointed out, the one day cannot represent the whole four-year period. If this court in Scrivener said that a 13% sample... There's no hard and fast rule in the Circuit, but a 13% sample is an appropriate estimate if you're going to apply it to the rest of the universe of the data. Here, one day out of three and a half years the case is .07%. How would they get the 13%? Random sampling. Is there an issue saying that that should be? The expert said that one week out of seven days of random sampling, that's about 14%. Okay, we understand your argument. Thank you very much. Thank you. The case is submitted 1610255.
judges: Fisher, Schroeder, N.R. Smith